## GOODYEAR TIRE & RUBBER CO. OF AKRON, OHIO, v. MILLER.

Circuit Court of Appeals, Ninth Circuit.
November 7, 1927.

Rehearing Denied December 12, 1927.

No. 5113.

1. **Specific performance ⬳71—Agreements to assign inventions and patents therefor are specifically enforceable.**

Agreements to assign inventions and patents therefor are specifically enforceable.

2. **Specific performance ⬳8—Specific performance of contract rests in court's discretion, to be exercised in accordance with equitable principles.**

Though specific performance of a valid contract is not an absolute right, but in a measure rests in the discretion of the court, such discretion must be exercised according to settled principles of equity, and not arbitrarily or capriciously.

3. **Specific performance ⬳50—Agreement to assign invention held not to lack consideration or mutuality, and not unfair, and employer entitled to specific performance.**

Agreement, signed by employee subsequent to his employment on monthly salary terminable at will, in which he agreed to assign to employer all inventions made during employment or within one year thereafter relating to employer's business, *held* not to lack consideration or mutuality, and not unconscionable or unfair, but was specifically enforceable by employer as contract fully executed by it.

4. **Specific performance ⬳51—Unfairness of contract sought to be specifically enforced must be determined as of time of making contract.**

Unfairness of a contract, asserted as ground for denying specific performance thereof, must be judged in relation to the time of making the contract.

5. **Master and servant ⬳62—Invention made by employee hired to make it belonged to employer, irrespective of contract to that effect.**

Where employee, who was employed exclusively in a department devoted to improve old and discover new processes and devices, was in the regular course of his employment assigned to develop a device to perform the certain function, invention made by him, which was adapted to performing such function, belonged to employer, irrespective of special contract to that effect.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Paul J. McCormick, Judge.

Suit by the Goodyear Tire & Rubber Company of Akron, Ohio, against Grover C. Miller. Decree for defendant (14 F.[2d] 776), and plaintiff appeals. Reversed, with directions.

O'Melveny, Millikin & Tuller, of Los Angeles, Cal., for appellant.

Robert Brennan, Richard Hartley, and Wm. B. Thomas, all of Los Angeles, Cal., for appellee.

Before HUNT, RUDKIN, and DIETRICH, Circuit Judges.

DIETRICH, Circuit Judge. This is a suit in which plaintiff seeks a decree for the specific performance of a contract between the parties for the transfer to the plaintiff of all defendant's interest in a certain invention relating to the manufacture of automobile tires, and made by the latter while in the former's employ. By the court below, the bill was dismissed with prejudice.

Defendant was first employed by plaintiff, at its Akron factory, in August, 1919, and continued in its service until December, 1920, when he was let go on account of depression in business. The department in which he was engaged had to do with the solution of mechanical problems arising in the production department, and necessarily demanded a measure of mechanical aptitude. He again obtained employment with the plaintiff in April, 1921, but at first only in testing and racking tubes, which required no mechanical or engineering skill, and accordingly at a much smaller compensation than he had formerly received, namely, 45 cents an hour. In this work he continued until July of that year, when, in compliance with his request, he was transferred to what was known as the machine design department, another division of the same department where he had been engaged in 1920. The function of this department, as defendant knew when he went into it, was to study and seek to improve processes and machinery used in connection with the manufacture of tires, and, doubtless in recognition of this higher type of service, his compensation was substantially increased. It was the custom of plaintiff to require all its employés in that department to execute a contract like that here involved, as apparently defendant knew, for he had signed such a contract after he went into that department during his first term of employment. On August 17, 1921, while he was at work, some one whom he had seen about the office, but whose name he did not know, presented to him the instrument in suit, with the request that he execute it.

He testifies that this person made some statement to the effect that it was a mere form, and did not mean anything, and further that, upon reading it, he concluded it was only an option. The contract is as follows:

"Agreement Between the Goodyear Tire & Rubber Company and G. C. Miller.

"In consideration of my employment and the salary to be paid for my services during the term of my employment with the Goodyear Tire & Rubber Company, I hereby agree, covenant, and contract with the Goodyear Tire & Rubber Company as follows:

"1. I agree to disclose to the factory manager of the Goodyear Tire & Rubber Company any and all improvements and inventions which I may make solely, or which I may make jointly or commonly with others, either during the term of my employment with the Goodyear Tire & Rubber Company or within a period of one year from the termination of my employment, in respect either to: (1) Methods, processes, or apparatus concerned with the production of any character of goods or materials sold or used by the Goodyear Tire & Rubber Company; or (2) in respect to any character of goods or materials sold or used by the Goodyear Tire & Rubber Company.

"2. I also agree to assign, transfer, and set over unto the Goodyear Tire & Rubber Company my entire right, title, and interest in and to any and all of such inventions as specified in paragraph 1 hereof, and in and to any and all applications for letters patent which may be filed on such inventions, and in and to all letters patent which may issue upon such applications.

"3. I also agree to sign all instruments necessary for the filing and prosecution of any applications for letters patent, of the United States or any foreign country, which the Goodyear Tire & Rubber Company may desire to file upon such inventions as are specified in paragraph 1 hereof; to sign all instruments necessary for filing and prosecution of any divisional applications which may be required upon such aforesaid applications for letters patent; to sign all instruments necessary for reviving or renewing any of such aforesaid applications for letters patent, in case revival or renewal of these applications hereafter becomes necessary; and to sign all instruments necessary to the filing and prosecution of any continued applications or reissue applications which may hereafter appear to be necessary to render such inventions as are mentioned in paragraph 1

effective and of full force for the purpose of the Goodyear Tire & Rubber Company.

"Signed this 17th day of August, 1921.

"Grover.          10/15/26    J F P

"[Signed]    George C. Miller.          P J M
                                                             J

"B. W. Litchfield,

"Vice President and Factory Manager.

"Witnesses: R. W. Snyder.

"E. J. Thomas."

Thereafter he continued in plaintiff's employ and in the line of service already explained until July 22, 1923, when he was granted a leave of absence with the privilege of returning; but upon September 30, 1923, he advised plaintiff that he had found employment elsewhere, apparently in Los Angeles, where he now resides, and did not expect to return.

After the execution of the contract, the chief of his division assigned to him the task, which was in the regular course of his employment, of developing and building a device for holding and rotating a tire while it was being lined. Accordingly he worked up a design which, after inspection and consideration by others in plaintiff's employ, was in due course approved. Whereupon, under another assignment from his superior, he superintended the building of such a machine, which, upon being finished and tested and changed in some particulars, was put into production. This machine, which has turned out to be valuable, is the invention in suit. To avoid jeopardy to the interests of both parties, an arrangement was made, after the controversy arose, by which defendant applied for patent, and we are informed by the briefs that, since the judgment below, letters have been issued to him.

We assume that, as was stated by the lower court, the idea or conception of a specific machine originated with the defendant, and he communicated the idea to his superiors, and received permission from them to work it out. But while he had not been specially engaged or employed to work out or produce this particular machine, or any specific machine or improvement, he was, as already stated, employed in a branch in plaintiff's business having to do exclusively with such improvements generally. He testified that, during all the time he worked in the mechanical design department, he knew his employer was spending large sums of money in maintaining it for the purpose of developing improvements and processes that would be beneficial and economical in the conduct of its business. To the following question put

to him on cross-examination he made the attendant answer: "Q. Didn't you know, as a matter of fact, that the very reason you were drawing that $200 a month and that you were employed there was that the Goodyear Company's officials felt that your services would be of value to them in perfecting just such inventions as this and others that would be helpful to them in the conduct of their business? A. Yes, sir." To be sure thereafter, upon redirect, he said: "By the compensation that I expected, I mean adequate compensation, based upon the results that might be secured and the consideration for having the patent assigned to them." But that would seem to be but a floundering effort to extricate himself from the implications of his previous answer.

[1, 2] For reasons peculiar to patents, as well as under general principles of equity, the specific performance of agreements to assign inventions and patents therefor is a well-recognized remedy. Conway v. White (C. C. A.) 9 F.(2d) 863; Mississippi Glass Co. v. Franzen (C. C. A.) 143 F. 501, 6 Ann. Cas. 707; Hulse v. Bonsack Machine Co. (C. C. A.) 65 F. 864; Toledo Machine & Tool Co. v. Byerlein (C. C. A.) 9 F.(2d) 279; Fullman v. Steel City, etc. (C. C. A.) 2 F.(2d) 4. True, specific performance of a contract valid in law is not an absolute right, but in a measure rests in the discretion of the court. Marks v. Gates (C. C. A.) 154 F. 481, 14 L. R. A. (N. S.) 317, 12 Ann. Cas. 120; Pope Mfg. Co. v. Gormully, 144 U. S. 224, 12 S. Ct. 632, 36 L. Ed. 414. Such discretion, however, must be exercised according to settled principles of equity, not arbitrarily or capriciously. Pomeroy's Equity Jurisprudence (4th Ed.) §§ 1404, 2184; Pomeroy's Specific Performance (3d Ed.) § 46.

[3] The contract is clear and unambiguous. Not only did defendant read it before he signed it, but, having for a long time had before him a similar instrument signed by him during his earlier employment, he must have been familiar with its terms. It was not wanting in mutuality merely because it was not demanded at the outset as a condition to his being employed, or because it did not bind plaintiff to keep him for any specified length of time. At the time the instrument was presented to him, plaintiff was under no obligation to continue him in its employ, and had the same right to make the requirement as a condition of retention as it would have had to impose it as a condition for hiring in the first instance, and to him the

consideration was as valuable in the one case as in the other. If plaintiff did not bind itself to employ him for any stipulated period, neither did he agree to remain for any designated length of time. Both parties were put upon the same footing and their rights and obligations were reciprocal. If, therefore, when he first thought of inventing a device, he preferred to withdraw from the obligation of the contract and work on the invention independently, and at his own expense and risk, that course was open to him. Instead, he worked at it in plaintiff's shop, with facilities supplied by it, and while he was being compensated for his time, and, we are inclined to believe, with some assistance from its other employés.

Remaining in plaintiff's employ for a considerable period after the invention was completed, he enjoyed the benefits of his contract, until he himself voluntarily terminated it, long after the right here in question had vested. Upon plaintiff's part the contract was thus fully executed, and the following language used in Mississippi Glass Co. v. Franzen (C. C. A.) 143 F. 501, 6 Ann. Cas. 707, a similar case, is particularly pertinent: "We are unable to accept the proposition that the contract here in question lacked mutuality. Undoubtedly there was reciprocity of obligations. Moreover, we are dealing with an executed contract. The defendant enjoyed the benefits of his contract for a period of over one year and eight months, and then left of his own accord. * * * The doctrine of nonenforcibility in equity of a contract for lack of mutuality has no application to an executed contract." See, also, Chicago, M. & St. P. Ry. Co. v. United States (C. C. A.) 218 F. 288, 301.

[4] There is no warrant for holding the contract unconscionable or unfair. "Unfairness must be judged of in relation to the time of making the contract." Pomeroy's Equity Jurisprudence (4th Ed.) § 2219. Defendant desired a transfer from work for which he was receiving 45 cents an hour to this department, where he was to receive $200 and later $225 per month. No significance is attached to the fact that this was less than he received for similar service under his earlier employment. Conditions may have been different; indeed, he himself testified that "there had been a decline in the industry in the interim." From his former experience he must have known it was customary to require such a contract from employés engaged in that department. It is fallacious to argue that, because there was an invention and it

turned out to be valuable, the contract was against good conscience. A witness for plaintiff testified that the department in which defendant was employed was constituted of various types of men—engineers, designers, machinists, and so on—reaching the number at one time of 800, and that the annual outlay incident thereto varied from $500,000 to $1,000,000; the money being "spent in various ways in testing and designing tires and machinery, methods, and processes used in the plants." Necessarily the output of any one of those so employed was problematical and highly contingent; success in achieving a substantially useful result it may be assumed is the exception rather than the rule. But if the company must compensate those who fail, and is to be denied the fruits in case of success, manifestly, such a department cannot be maintained, and all organized enterprise for the improving of the art must cease.

[5] We are of the opinion, not only that plaintiff is entitled to specific performance of the formal contract of assignment, but, without it, it would still be entitled to substantially the same relief by reason of the implications of the primary contract of employment. It is not a case of one who, being employed for a general service, makes an invention on the side, outside of his line of duty. Defendant was employed exclusively in a department, the function of which was to improve old and discover new processes and devices. Such was the service for which he was paid, and while so employed he was, in the regular course of his employment, assigned to the specific task of developing a device to perform the very function for which the invention in suit is adapted. We can see no distinction between a case where one is originally employed for the limited purpose of solving a specific mechanical problem and another case where he is employed generally to concern himself with such problems and during the course of the employment and within the scope thereof, is assigned to a specific one. In either case the fruits of his endeavor belong to his employer. This view we think is fully supported by Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033. See, also, Magnetic Mfg. Co. v. Dings Magnetic Separator Co. (C. C. A.) 16 F. (2d) 739; U. S. v. Houghton (D. C.) 20 F. (2d) 434; Wireless Specialty Apparatus Co. v. Mica Condenser Co., 239 Mass. 158, 131 N. E. 307, 16 A. L. R. 1170.

The decree is reversed, with instructions to grant relief as prayed.